UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EUGENE MEIER,<br><br>                              Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>                              Defendant. | Case No.:  16cv1837 - BEN (PCL)<br><br>**REPORT AND<br>RECOMMENDATION OF U.S.<br>MAGISTRATE JUDGE RE:**<br><br>**PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT [Doc. 14];<br>and**<br><br>**DEFENDANT'S CROSS MOTION<br>FOR SUMMARY JUDGMENT [Doc.<br>15]** |

## I. INTRODUCTION

Plaintiff Eugene Meier has filed a complaint seeking judicial review of Defendant Social Security commissioner Carolyn W. Colvin's denial of his application for Supplemental Security Income and for Disability Insurance Benefits under the Social Security Act. (Doc. 1.) Plaintiff has filed a Motion for Summary Judgment (Doc. 14), and Defendant filed a Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion. (Doc. 15.) Plaintiff then filed a Reply to Defendant's motion. (Doc. 17.) For the

1

reasons set forth below, the Court recommends that Plaintiff's motion be **DENIED** and that Defendant's motion be **GRANTED**.

## II. PROCEDURAL HISTORY

On June 12, 2012, Plaintiff filed an application for Supplemental Security Income pursuant to Title XIV of the Social Security Act, alleging disability beginning November 1, 2011 due to hypertension, degenerative disc disease, asthma, chronic obstructive pulmonary disorder ("COPD"), and sleep apnea. (A.R. 191-196, 223.) Plaintiff's applications were denied initially and upon reconsideration. (A.R. 79-86, 88-98.) Thereafter, Plaintiff filed a written request for a hearing. (A.R. 118-120.) An Administrative Law Judge ("ALJ") held the hearing on December 2, 2014. (A.R. 51-78.) On January 23, 2015, the ALJ issued a written decision finding Plaintiff not disabled because he could perform a significant number of jobs in the national economy. (A.R. 27-40.) After considering all the evidence in the record as a whole, the ALJ found:

1. Plaintiff had not engaged in substantial gainful activity since the application date, June 12, 2012. (A.R. 32.)

2. Plaintiff had the following severe impairments: asthma, COPD, and obesity. (A.R. 32.)

3. Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (A.R. 35.)

4. Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following limitations: can sit for 6 hours in an 8 hour workday; stand and/or walk for 6 hours in an 8 hour workday; occasionally lift twenty pounds, and frequently lift ten pounds; occasionally balance, stoop, kneel, crouch, crawl, and climb stairs; never climb ladders, ropes, or scaffolds; and cannot withstand concentrated exposure to temperature extremes, humidity, dust, fumes, gasses, and other pulmonary irritants. (A.R. 35.)

5. Plaintiff is unable to perform any past relevant work. (A.R. 38.)

6. Plaintiff was 50 years old on the application date, which is defined as an individual closely approaching advanced age. (A.R. 39.)

7. Plaintiff has limited education and is able to communicate in English. (A.R. 39.)

8. Transferability of job skills is immaterial to the determination of disability because the Medical-Vocational Rules supports a finding that Plaintiff is "not disabled." (A.R. 39.)

9. In light of Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (A.R. 39.)

10. Plaintiff has not been under a disability, as defined in the Social Security Act, since June 12, 2012, the application date. (A.R. 40.)

On April 18, 2016, the Appeals Council denied Plaintiff's request to review the ALJ's decision, making that the Commissioner's final decision. (A.R. 11-16.) Plaintiff then filed a federal complaint seeking judicial review of the Commissioner's decision. (Doc. 1.)

### III. ADMINISTRATIVE RECORD

Plaintiff Eugene Meier is five feet, seven inches tall, weighs 245 pounds, and was 50 years old when he applied for benefits. (A.R. 79.) He worked as a cement finisher from January 2007 to January 2009 and also worked as a plumber from August 2011 to November 2011. (A.R. 191-96.)

A. Medical Evidence

1. Treating Physician

Plaintiff's treatment records with Dr. Taikeun Park at Family Health Centers of San Diego begin with a visit on October 24, 2011. (A.R. 343.) At that appointment, Plaintiff complained of worsening asthma and indicated that it was becoming more difficult to continue his plumbing work. (Id.) Dr. Park's treatment plan included medications to treat asthma, high blood pressure, high cholesterol, and obesity. (Id.) Plaintiff next visited Dr. Park on December 15, 2011 following an asthma-related visit to the emergency room on November 29, 2011. (A.R. 342.) Dr. Park added additional asthma medications as part of

3

Plaintiff's treatment plan. (Id.) An additional visit for worsening shortness of breath on January 16, 2012 produced similar notes and treatment plans for asthma, high blood pressure, high cholesterol, and obesity, but also added sleep apnea to Plaintiff's diagnoses. (A.R. 341.) Two months later, Plaintiff was seen following a mild asthma attack and requested participation in a sleep study for his sleep apnea. (A.R. 340.) The notes from Plaintiff's March 15, 2011 visit indicate that Plaintiff had lost twenty-five pounds since his January visit, was now also complaining of shoulder tendinitis, and erectile dysfunction. (Id.) Dr. Park gave Plaintiff Tylenol and Flexeril to treat his shoulder pain, additional medication to treat erectile dysfunction, and a lipid panel was ordered. (Id.)

Notes from Plaintiff's April 17, 2012 visit with Dr. Park indicate Plaintiff's blood pressure was under control with the help of his new medication and that a continuous positive airway pressure ("CPAP") machine was helping Plaintiff sleep better. (A.R. 338.) Plaintiff's asthma medications were reduced to Qvar and an albuterol inhaler, and Dr. Park continued Flexeril to treat Plaintiff's shoulder. (Id.) In May, 2012, Plaintiff's treatment notes indicate Plaintiff was also suffering from leg edema. (A.R. 337.) Plaintiff was given additional medication to treat his high blood pressure, however the medication for his shoulder pain and asthma remained the same. (Id.)

On August 15, 2012, Plaintiff presented to Dr. Park with decreased extension and flexion in his shoulder and moderate leg edema in addition to the consistent medical issues Plaintiff suffered from including asthma, high blood pressure, obesity, sleep apnea, and impotence. (A.R. 334-36.) On October 17, 2012, Plaintiff displayed no edema, however Dr. Park noted Plaintiff suffered from airway obstruction (COPD). (A.R. 331-33.) Notes from these visits mention no worsening of Plaintiff's asthma or shoulder impairments. (A.R. 331-36.) At a follow-up visit after a cardiology consultation, Dr. Park's notes indicate that Plaintiff had no leg edema. (A.R. 328.) Plaintiff's medication was not altered and no notes indicate any worsening of Plaintiff's condition. (A.R. 328-29.)

Treatment notes from Plaintiff's visits on December 19, 2012 and February 20, 2013, only address Plaintiff's asthma, where Dr. Park categorizes it as stable in December

and exacerbated in February. (A.R. 359-64.) These treatment records do not include information on Plaintiff's sleep apnea, high blood pressure, shoulder pain, impotency, or leg edema. (Id.)

Plaintiff again visited Dr. Park on May 8, 2013, expressing disappointment in his weight gain and that he was contemplating weight loss surgery. (A.R. 356.) Plaintiff reported that he tries to walk around the block twice and was trying to eat healthier. Plaintiff also reported feeling depressed and down for the previous few months and while thankful for having a roof over his head, was feeling "like I'm right on the edge." (Id.) Plaintiff denied suicidal ideation, however did request a therapy referral. At this May appointment Plaintiff had coarse breath but no wheezing and no edema. (Id.) Dr. Park encouraged Plaintiff to increase his exercise and modify his unhealthy diet. Dr. Park also advised Plaintiff that if his insurance would cover it, gastric bypass surgery would represent a serious life change that would require Plaintiff to undergo an extensive weight loss regimen, even before the operation. (Id.) Plaintiff indicated that he understood and would call his insurance provider to see if the procedure was covered. (A.R. 357.)

Plaintiff was treated by one of Dr. Park's co-workers at Family Health Centers of San Diego on May 22, 2013, following a five-day hospitalization. (A.R. 45-459.) Dr. Andrea Crosby Shah indicated that Plaintiff's breathing had recovered, and that he had diabetes. (Id.) Another co-worker, Dr. Diana Kolman, saw Plaintiff following another hospitalization for dehydration and elevated glucose levels. (A.R. 455-457.) Plaintiff displayed no wheezing, some leg edema, and reported increased difficulty sleeping due to his apnea. (A.R. 455.) Notes from that visit indicate Plaintiff was continuing to gain weight, was his mother's primary care giver, and reported depression and anxiety with occasional suicidal ideation without intent to complete. (Id.)

Dr. Park's treatment notes from July 12, 2013, following hospitalization for exacerbation of asthma and diabetes complications, also include reference to a lump and pain in the back of Plaintiff's neck. (A.R. 460.) Plaintiff's asthma medications remained the same following this visit, and notes indicate that Plaintiff's shoulder issues were being

5

treated with aspirin. (A.R. 461.) Dr. Park suggested both imaging and surgery consultations with respect to the lump on Plaintiff's neck. On August 1, 2013, Dr. Park noted that the lump on Plaintiff's neck was a sebaceous cyst and recommended antibiotics, Percocet for pain control, and cleaning with hydrogen peroxide. (A.R. 463-64.)

Treatment notes for visits on October 22, 2013, May 9, 2014, and August 15, 2014 all reflect fairly consistent treatment for Plaintiff's asthma and COPD, hypertension, obesity, heart failure, diabetes, and shoulder pain. (A.R. 453-472.) Plaintiff's asthma was consistently treated with an albuterol rescue inhaler, and throughout this time Plaintiff's shoulder was only mentioned in the May 2014 treatment notes. (Id.) Additionally, Plaintiff reported at the October 2013 visit that he was exercising daily on a treadmill. (A.R. 465.)

Plaintiff's final treatment notes from Dr. Park are from an August 26, 2014 visit where Plaintiff collected documents relevant to his application for disability benefits. (A.R. 450-452.) Plaintiff had continued to gain weight steadily and displayed moderate shortness of breath. At this appointment Plaintiff had severe bilateral leg edema. (Id.) Dr. Park added Qvar to Plaintiff's asthma treatment plan, suggested Plaintiff get a home blood pressure monitor, and noted that Plaintiff's diabetes was well-controlled. (A.R. 451.)

Dr. Park completed a Treating Source Physical Capacities Evaluation form on November 19, 2014. (A.R. 485-86.) Dr. Park indicated that in an eight-hour work day, Plaintiff could sit for two hours and stand/walk for two hours and would need an opportunity alternate sitting and standing at will throughout the workday. (Id.) Dr. Park also indicated that Plaintiff could use both right and left hands for more than a third of an eight-hour day to do simple grasping, pushing and pulling, and fine manipulation, and that Plaintiff could also use both hands and both feet for repetitive motion tasks. (Id.)

Dr. Park noted that Plaintiff could frequently lift or carry zero to five pounds and six to ten pounds, occasionally carry eleven to twenty pounds, and never carry anything over twenty-one pounds. (A.R. 486.) Further, Dr. Park limited Plaintiff to never climbing, balancing, stooping, kneeling, or crouching, while indicating Plaintiff could occasionally crawl or reach above shoulder level. (Id.) Plaintiff, according to Dr. Park, had severe

restriction in unprotected heights, being around machinery, and exposure to dust, fumes, and gasses, and a moderate restriction in exposure to marked changes in temperature and humidity and driving automotive equipment. (Id.) Finally, Dr. Park indicated that Plaintiff's pain is severe in that it would preclude the concentration and attention required for even simple, unskilled work tasks.)

### 2. Emergency Room and Hospital Visit Records

Plaintiff was hospitalized at Sharp Chula Vista Medical Center on September 12, 2011, presenting with left-sided flank pain. (A.R. 289-99.) Plaintiff displayed no difficulty breathing, no chest pain, and no rashes or swelling. (A.R. 292.) Plaintiff was positive for nausea and vomiting and flank pain that radiated to his groin, and complained of lower left extremity swelling. (Id.) Plaintiff received treatment for wheezing and intravenous fluids. (A.R. 290.) Plaintiff's medications included Albuterol, Atorvastatin, Hydrochlorothiazide, Lisinopril, and Percocet. (A.R. 291.) The diagnostic impression from this hospitalization was that Plaintiff suffered from a left kidney stone, left hydroureteronophrosis, left lower extremity swelling, and poorly-controlled hypertension. (A.R. 290.) Plaintiff was placed under observation, cautioned that his high blood pressure was poorly-controlled, and sent home. (Id.)

Plaintiff was again treated on July 6, 2012. (A.R. 322-24.) Plaintiff arrived with the assistance of paramedics as he was experiencing difficulty breathing. Plaintiff experienced shortness of breath after eating lobster, so he was unsure if he was experiencing an allergic reaction to the shellfish. (A.R. 322.) By the time Plaintiff arrived at the hospital, his symptoms had resolved. Plaintiff experienced some throat discomfort, but did not develop a rash. (Id.) Plaintiff's medications at the time of his visit included Albuterol, Amlodipine, Flovent, Foradil, Lipitor, and Lisinopril. (A.R. 323.) Plaintiff displayed clear breathing without wheezing and a full range of motion in the extremities. (Id.) During transport to the hospital Plaintiff took Benadryl and was given Prednisone in the emergency room, both to combat the potential allergic reaction. (A.R. 324.) Plaintiff was diagnosed with acute throat tightness and difficulty breathing, likely secondary to an allergic reaction, a history

of asthma, hypertension, and sleep apnea. (Id.) Plaintiff was discharged with direction to continue taking the Prednisone and suggested follow up with his primary doctor for reexamination as necessary. (Id.)

Plaintiff was hospitalized for five days starting May 10, 2013. (A.R. 369-396.) Plaintiff was initially diagnosed with asthma exacerbation which was initially treated with empiric antibiotics, Solu-Medrol, and a nebulizer. (A.R. 369.) Eventually Plaintiff was tapered off the Solu-Medrol and switched to Prednisone. Plaintiff's diabetes was also treated with insulin. (A.R. 369-70.) Plaintiff also displayed significant lower extremity edema and was counseled on the importance of weight loss, diet, and exercise. (A.R. 370.)

Plaintiff was hospitalized for three days starting January 1, 2014. (A.R. 421-442.) Plaintiff was admitted presenting with a right nasal abscess, severe pain, and hyperglycemia. Plaintiff took antibiotics and then underwent an incision and debridement of his abscess. (A.R. 421.) Plaintiff was again hospitalized for two days beginning on June 14, 2014, for acute renal failure. (A.R. 406-20.) The last hospitalization noted in Plaintiff's records indicate that Plaintiff was hospitalized on September 25. 2014, after complaining of shortness of breath and hyperglycemia. (A.R. 487-96.) Plaintiff was diagnosed with acute dyspnea secondary to acute asthma exacerbation, peripheral leg edema, acute weakness secondary to severe hyperglycemia that is improved, and morbid obesity. (A.R. 489.) Plaintiff was discharged the same day with a follow up appointment scheduled for the following day. (Id.)

### 3. Psychiatric Records

Plaintiff presented for a psychiatric evaluation on June 18, 2013 and was seen by Psychiatrist Gregory M. Nicholson, M.D. (A.R. 398-405.) During his evaluation Plaintiff indicated he was feeling anxious and depressed due to unemployment. (A.R. 400.) Plaintiff told Dr. Nicholson that while in prison he witnessed another inmate being killed and that his son died at four months, both of which have caused Plaintiff to have nightmares. (Id.) Plaintiff endorsed feelings of guilt, insomnia, decreased energy, trouble concentrating, and decreased interest in normal activities. Plaintiff denied any history of suicidality and denied

any history of symptoms related to psychosis or mania. (Id.) Plaintiff indicated he was not taking any psychiatric medications, but did have a past history of drug and alcohol use. (Id.) There was no concerning appearance or attitude and Dr. Nicholson reported that Plaintiff denied any plan to harm himself or others. (A.R. 401.)

With respect to his activities of daily living, Plaintiff reported that he was living with his mother. (A.R. 401.) Plaintiff cooked meals, did laundry, and drove himself. Additionally, Plaintiff indicated no difficulty in dressing, bathing, or personal hygiene. (Id.) Plaintiff stated he was able to handle bills and cash and could go out on his own. (Id.)

Dr. Nicholson's notes indicated that Plaintiff's mood was depressed and affect dysphoric. (A.R. 402.) Dr. Nicholson's diagnostic impression included methamphetamine dependence, in remission; anxiety disorder, not otherwise specified and depressive disorder, not otherwise specified. (A.R. 403.) Plaintiff's condition was expected to improve over the following twelve months with active treatment. (Id.)

Based on the psychiatric evaluation, Dr. Nicholson indicated that:

1. Plaintiff is able to understand, remember, and carry out simple one or two-step job instructions;

2. Plaintiff is able to do detailed and complex instructions;

3. Plaintiff's ability to relate and interact with coworkers and the public is mildly limited;

4. Plaintiff's ability to maintain concentration and attention, persistence and pace is mildly limited;

5. Plaintiff's ability to accept instructions from supervisors is mildly limited;

6. Plaintiff's ability to maintain regular attendance in the work place and perform work activities on a consistent basis is not limited; and

7. Plaintiff's ability to perform work activities without special or additional supervision is mildly limited.

///
///

9

### 4. Consulting Physicians

On December 10, 2012, state agency medical consultant Dr. Thu Do, MD, provided a Residual Functional Capacity determination based on Plaintiff's provided medical information. (A.R. 79-86.) Dr. Do reported that Plaintiff's medically determinable impairments were severe asthma, a degenerative back disorder, severe COPD, and a severe disorder of muscle, ligament, and fascia. (A.R. 82.) Dr. Do considered Listing 3.03 – Asthma, however he determined that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of his symptoms were not sustained by the objective medical evidence alone. (Id.) Further, Dr. Do found Plaintiff partially credible and indicated that Plaintiff's medical issues were shown to be stable with medication. (Id.) Dr. Do's RFC determination limited plaintiff to occasionally lifting and carrying twenty pounds, frequently lifting and carrying ten pounds, standing or walking for six hours in an eight-hour day, sitting for six hours in an eight-hour day, and unlimited pushing and pulling. (A.R. 83.) Additionally, Plaintiff was limited to occasionally climbing ramps and stairs, ladders, ropes, or scaffolds, balancing, stooping, kneeling, crouching, and crawling. (Id.) In terms of environmental limitations, Dr. Do indicated Plaintiff should avoid concentrated exposure to both extreme cold, extreme heat, humidity, and fumes, odors, dusts, gases, and poor ventilation. (A.R. 84.) Based on his determination Plaintiff's physical RFC, Dr. Do indicated Plaintiff should be limited to light work, ultimately finding Plaintiff was not disabled. (A.R. 85-86.)

On June 27, 2013, state agency medical consultant Dr. K. Mauro, M.D., reviewed both the medical evidence and Dr. Do's determination. (A.R. 88-98.) Dr. Mauro noted Plaintiff's claims that asthma and COPD had worsened and that his shoulder pain limited his ability to reach. (A.R. 89.) Ultimately, Dr. Mauro indicated that there were no objective findings that contradicted Dr. Do's prior decision, especially after considering Plaintiff's activities of daily living and that Plaintiff's impairments proved to be stable with medication. (A.R. 92, 94.) While Dr. Mauro agreed that Plaintiff experienced some impairment, it was not significantly limiting to Plaintiff's function. (A.R. 94.)

## B. Administrative Hearing

### 1. Plaintiff's Testimony

Plaintiff testified before ALJ Keith Dietterie on December 2, 2014. (A.R. 51-77.) Plaintiff was represented by attorney Kathleen Holden, who was present for the hearing. (Id.) Behnush Barzegarian Mortimer, a Vocational Expert, also testified as to Plaintiff's work history and future employability. (A.R. 75-77.)

Plaintiff testified that he completed eleventh grade and that although he did begin, he had not completed a GED. (A.R. 56.) Plaintiff's last employment was as a plumber's assistant for roughly six months before being let go because his breathing made it impossible to keep up with the work demands. (Id.) Plaintiff further testified that he worked on and off for twenty-five years as a cement finisher and that during that time he was lifting upwards of ninety pound sacks of concrete and pallets forty at a time. (Id. at 56-57.)

At the time of the hearing Plaintiff testified that he weighed 285 pounds but indicated that this weight was reflective of a recent 100 pound weight gain. (A.R. 58.) Plaintiff testified that he has been a life-long sufferer of both asthma and bronchitis. To treat his asthma, Plaintiff uses a rescue inhaler and when the inhaler is ineffective, he has to go to the hospital. (Id.) Plaintiff reported that he has suffered from at least sixty asthma attacks in his life and that he had been to the hospital eight times in 2014. (A.R. 58-59.) Plaintiff also indicated that he has had issues with COPD and kidney stones, both of which he still suffers from and high blood pressure that is under control with the use of Lipitor. (A.R. 61, 62.) Plaintiff testified that he carries a rescue inhaler and uses Qvar daily to treat his asthma. (A.R. 60.) Plaintiff further testified that he would take Symbicort if he was able to afford it, an impossibility without health insurance. (Id.)

Plaintiff testified to consistent arthritic pain in his right shoulder, beginning when he was working with cement. (A.R. 62.) Plaintiff demonstrated that he was unable to raise his arm above shoulder level. (Id.) When asked to rate his pain on a scale of zero to ten with zero being no pain and ten being severe pain that would send Plaintiff to the emergency room, Plaintiff indicated that on average his shoulder pain is at a seven. (A.R. 63.) Plaintiff

takes Flexural for the pain and reported that it "gets [him] through the day." (Id.) Plaintiff also testified that for the past five or six years he has suffered from peripheral edema, swelling in both of his feet. (A.R. 73.) As a result, he has to modify his shoes to accommodate the changes in his feet and because tying the laces would cut off his circulation. (Id.) Additionally, Plaintiff suffers from Diabetes, for which he is treated with Metformin. (A.R. 74.)

Plaintiff testified that he sees Dr. Park for treatment for his shoulder monthly if he is able to get appointments. (A.R. 63.) Plaintiff further indicated that he regularly sees a psychologist due to depression with suicidal ideation. (A.R. 64.) Plaintiff reported that he is depressed "[p]retty much all the time" and last experienced suicidal ideations three months before the hearing. (Id.) He testified that he treats his depression with Wellbutrin. (A.R. 66.) Plaintiff also testified that when he is extremely anxious, it causes him to have problems with his asthma. (Id.)

As to daily home life, Plaintiff testified that he currently lives with his mother, who does all the cooking at home, and doesn't have many friends with whom to socialize. (A.R. 65, 68.) Plaintiff reported that he did not have a car, but did have a current driver's license. Plaintiff indicated that he spent his days keeping to himself, watching television. (Id.) Plaintiff said that he experience instances where he is unable to maintain concentration on the television programming he watches. (A.R. 66.) Plaintiff also testified that he needs, but does not wear, glasses. (Id.) Plaintiff indicated that he has difficulty dressing himself. (A.R. 68.)

Plaintiff testified that in 2008 he abused methamphetamines, which resulted in his incarceration. (A.R. 66-67.) While in prison, Plaintiff received psychiatric treatment and treatment for his asthma. (A.R. 67.)

Plaintiff testified that he has difficulty sitting and can probably average forty to forty-five minutes before he experiences circulation problems and his legs and feet get "tingly" and go numb. (A.R. 69-70.) He also indicated that he has problems standing in one position due to pain in his feet, limiting him to standing for an hour or hour and a half. (A.R. 70.)

To alleviate his issues, Plaintiff lays on his back with his legs up, sometimes for up to four hours. (Id.) Due to shortness of breath, Plaintiff does not walk too far from his house, limiting himself to roughly one block. (Id.) Plaintiff's mother underwent two hip surgeries that required Plaintiff to help her move about the house and get to appointments. (A.R. 72.) Plaintiff receives additional help from Plaintiff's brother and their mother's friend. (Id.)

Last, Plaintiff testified that as recently as 2014, he was searching for a job. (A.R. 72.) Plaintiff testified that he was looking at McDonalds or a similar establishment, but that he did not believe he would be able to stand on his feet as long as the job would require. (A.R. 73.) When asked if he thought he could work for eight hours a day, five days a week, Plaintiff said that he did not. (Id.)

## 2. Vocational Expert's Testimony

Vocational expert Behnush Barzegarian categorized Plaintiff's past job as a cement mason as heavy exertion, skilled work and his past job as a plumber helper as heavy-exertion, semi-skilled work. (A.R. 75.) The ALJ Proposed the following hypothetical to Ms. Barzegarian: assuming an individual closely approaching advanced age with an eleventh grade education; who is literate, speaks English, and has prior work experiences similar to that of Plaintiff and would be limited to sitting six hours in an eight-hour day; can occasionally lift twenty pounds, frequently lift ten pounds; can occasionally climb stairs; should never climb ladders, scaffolds, ropes; can occasionally balance, stoop, kneel, crouch, and crawl; should have no concentrated exposure to temperate extremes; no concentrated exposure to humidity; no concentrated exposure to dust, fumes, and gases, would that individual be able to return to either of Plaintiff's past jobs? The vocational expert testified that such an individual would not be able to return to either a cement mason or plumber helper position. (A.R. 75-76.) Ms. Barzegarian did, however, indicate that the following jobs would exist in the labor market: cashier and sales attendant, both light exertion and unskilled work. (A.R. 76.)

The ALJ then proposed a hypothetical based on Dr. Park's RFC determination. The same hypothetical person, limited to the RFC restrictions as proposed by Dr. Park (sitting

two hours in an eight-hour day, stand and walk two hours in an eight-hour day; can occasionally lift twenty pounds frequently lift ten pounds; should never climb, balance, stoop, kneel, crouch; can only occasionally crawl; can only occasionally reach above shoulder level; should not work at unprotected heights, around dangerous or fast-moving machinery; should not be exposed to dust, fumes, and gases; have no concentrated exposure to temperature and humidity changes, and driving automotive equipment), would be unable to return to past work, according to Ms. Barzegarian, and there would be no available jobs in the market. (A.R. 76.) When asked if an individual with the same age, education, work experience of Plaintiff who was limited to standing and walking less than two hours in an eight-hour workday, but could sit the rest of the day, would the individual be able to perform the past relevant work, Ms. Barzegarian again said no. (A.R. 77.)

## IV. ALJ DECISION

The ALJ sought to determine whether Plaintiff was disabled under section 1614(a)(3)(A) of the Social Security Act. (A.R. 30.) The ALJ ruled that Plaintiff was not disabled as defined by the Act since June 12, 2012, Plaintiff's application date. (A.R. 27, 40.)

The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. 416.920(a). (A.R. 30.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date. (A.R. 32.) At step two, the ALJ found that Plaintiff had severe impairments of asthma, COPD, and obesity. (Id.) At step three, the ALJ determined that none of Plaintiff's impairments or combination of impairments met or equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings). (A.R. 35.) The ALJ next determined that Plaintiff retained the RFC to perform light work except that he was restricted to sitting for six hours in an eight hour workday; standing and/or walking for six hours in an eight hour workday; occasionally lifting twenty pounds, and frequently lifting ten pounds; occasionally balancing, stooping, kneeling, crouching, crawling, and climbing stairs; never climb ladders, ropes, or scaffolds; and cannot withstand concentrated exposure to temperature extremes, humidity, dust, fumes, gasses, and other pulmonary

irritants. (Id.) The ALJ found that Plaintiff's subjective symptom testimony was not fully credible. (A.R. 36.) At step four, the ALJ found that Plaintiff is unable to perform any past relevant work. (A.R. 38.) Finally, at step five the ALJ found that considering Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff was capable of performing. (A.R. 39.) As a result of the five-step analysis, the ALJ concluded that Plaintiff was not disabled as defined by the Act. (A.R. 40.)

The ALJ weighed the evidence in Plaintiff's case as follows. At the hearing Plaintiff testified that he experiences asthma attacks and has shortness of breath upon physical exertion, that he experiences leg numbness after 45 minutes of sitting, but that he can stand for 60 to 90 minutes at a time. (A.R. 36.) Plaintiff testified that he can walk up to 100 feet at a time and is limited to lifting items weighing no more than ten pounds, and that in 2014 he was job searching at McDonalds and similar establishments, but was unsure he could stand on a full-time basis. (Id.)

Despite his impairments, medical records indicated that Plaintiff displayed mild limitation of his activities of daily living. (A.R. 32.) The ALJ pointed out that Plaintiff cooks meals, does laundry, operates his own vehicle, is capable of going out on his own, and has no difficulty dressing, bathing, or with personal hygiene. (A.R. 32, 401.) Further, the ALJ indicated that records establish Plaintiff as the primary caregiver for his mother, with whom he lives. (A.R. 32, 455.)

Despite Plaintiff's allegations of pain from degenerative disc disease, the ALJ noted that there was no medical documentation to support the diagnosis. (A.R. 36.) While Plaintiff reasonably could have pain from leg edema, the ALJ noted that the medical records show that the pain is controlled with only acetaminophen and not any narcotic pain reliever. (Id.) Plaintiff alleged numbness in his legs after sitting for forty-five minutes or standing for sixty to ninety minutes, however the ALJ indicated that the medical records did not establish any medically determinable impairment that would cause leg numbness. Despite diabetes, Plaintiff has no diagnosis of neuropathy that would cause pain or

numbness. (Id.) Further, Plaintiff did not report anything to his treating physician that would support a limitation to lifting only ten pounds or walk 100 feet. (Id.)

The ALJ then summarized Plaintiff's hospitalizations. First, November 30, 2011 and December 15, 2011 treatments at Sharp Chula Vista Medical Center for exacerbated asthma symptoms. (A.R. 36-37.) Because of financial difficulty, Plaintiff had not been compliant with his medical treatment. Plaintiff was treated with intravenous steroids and albuterol nebulization and had significant improvement. Plaintiff was again treated at the ER, given prednisone, and his symptoms did not return. (Id.) The ALJ also highlighted different hospital visits on July 23, 2012, May 10, 2013, and September 25. (A.R. 37.) On May 10, 2013, chest x-rays showed mild left atelectasis or infiltrate present in the left lung, while vascular labs were negative for deep venous thrombosis. (Id.) At his September 25, 2014 emergency room visit, Plaintiff's chest was nontender and he was not wheezing. His chest x-ray was normal and chest scan was within normal limits. There was no evidence of deep venous thrombosis and Plaintiff was discharged the same day in stable condition. (Id.)

Next, the ALJ discussed the medical records of treating physician Dr. Park. (A.R. 37.) Dr. Park treated Plaintiff from October 2011 until August 2014. Dr. Park diagnosed Plaintiff with asthma, COPD, and sleep apnea. Exam notes of Plaintiff's lungs showed variation over time, sometimes symptomatic and sometimes asymptomatic. The ALJ surmised that Plaintiff's average of only one hospitalization a year indicated that Plaintiff responded fairly well to treatment. (Id.) In November 2014, Dr. Park's RFC determination limited Plaintiff to lifting/carrying twenty pounds occasionally, and ten pounds frequently; standing and/or walking for two hours in an eight hour work day, sitting for a total of two hours in an eight-hour work day, and requiring the opportunity to alternate sitting and standing at will throughout the work day. Dr. Park opined that Plaintiff would have no limitation with use of his hands or feet and that Plaintiff would never be able to perform any postural activities, except for occasional crawling and reaching above shoulder level. The ALJ indicated that Dr. Park's restrictions on Plaintiff's exposure to unprotected heights, being around machinery, and exposure to dust and fumes were severe and

indicated moderate restrictions on exposure to marked changes in temperature and humidity and driving automotive equipment. (Id.) Dr. Park's opinion indicated that Plaintiff's severe pain precluded him from the concentration and attention required for even simple unskilled work tasks. (Id.)

The ALJ assigned Dr. Park's opinion little weight. (A.R. 38.) Dr. Park's high level of limitation was, according to the ALJ, unsupported by rationale. The ALJ indicated that Dr. Park's treatment records demonstrate that Plaintiff's medical impairments were controllable with medication and prescribed treatment including regular exercise. Additionally, the ALJ found that Dr. Park's limitations were inconsistent, citing as an example that Plaintiff was completely unable to stoop, but could sit, noting that sitting requires, in some capacity, stooping. (Id.)

The ALJ then discussed state agency medical consultant Dr. Thu Do, M.D.'s, RFC opinion based on his review of the medical records, which provided that despite some physical and environmental limitations, Plaintiff was not disabled. (A.R. 37.) Additionally, the ALJ indicated that Dr. K. Mauro, another state consultant, reviewed both the medical records and Dr. Do's RFC determination and concurred with Dr. Do's determination. (A.R. 38.)

The ALJ assigned great weight to the consulting opinions of Dr. Do and Dr. Mauro. (A.R. 38.) Dr. Do's opinion was afforded great weight because it was supported by Plaintiff's medical evidence as a whole. The ALJ did, however, disagree with Dr. Do's determination that Plaintiff would be able to climb ladders, ropes, or scaffolds. (Id.)

## V. STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show that: (1) he suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he previously performed or any other substantially gainful

employment that exists in the national economy. See 42 U.S.C.A. § 423 (d)(1)(A) (West 2004). An applicant must meet both requirements to be "disabled." Id.

## A. Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are as follows: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled. If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work he has done in the past. If so, the claimant is not disabled. If not, the evaluation proceeds to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 CFR § 404.1520; see also Tackett v. Apfel, 180 F. 3d 1094, 1098-99 (9th Cir. 1999).

## B. Judicial Review

Sections 206(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless: (1) the ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 2001); Desroisers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Vasquez v.

Astrue, 547 F.3d 1101, 1104 (9th Cir. 2008) (quoting Andrews, 53 F.3d at 1039). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. Id. (citation and quotations omitted). "A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A §405(g). This matter may also be remanded to the Social Security Administration for further proceedings. Id.

## VI. DISCUSSION

Plaintiff argues that the ALJ committed error by failing to give Dr. Park's treating physician opinion the greatest weight in determining Plaintiff's RFC. (Doc. 14-4.) Defendant asserts that the ALJ provided good reasons for the weight given to the medical opinion evidence and that the RFC assessment is supported by substantial evidence. (Doc. 16-1.)

As a general rule, more weight should be given to the opinion of a treating source than to the opinion of a source who does not treat the claimant. Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995.); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The rationale behind affording the treating physician's opinion greater weight is that "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." Winans, 853 F.2d at 647. There is a requisite presumption that the opinions of treating physicians are entitled to greater weight than the opinions of examining and non-examining physicians, and that the opinions of examining physicians are entitled to greater weight than the opinions of non-examining physicians. See 20 C.F.R. § § 404.1527(d); 416.927(d); 20 C.F.R. § 404.1527(c); Smolen v. Chater, 80 F.3d 1273, 1283 (9th Cir. 1996.)

An ALJ may disregard a treating source's opinion whether or not that opinion is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). Where the treating source's opinion is not contradicted by another source, it may be rejected only for clear and convincing reasons. Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991).

When evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings. Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The more consistent a medical opinion is with the record as a whole, the more weight it is given. See 20 C.F.R. § 404.1527(d)(4). A treating source's opinion on the nature and severity of an impairment is given controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with other substantial evidence of record. See 20 C.F.R. § 404.1527(d)(62). The opinion of a consultative examiner that rests on the examiner's own independent examination and clinical findings can alone constitute substantial evidence for rejecting a conflicting opinion from a treating source. See Tonapetyan, 242 F.3d at 1149.

The opinion of a non-examining source cannot alone constitute substantial evidence that justifies rejecting the opinion of either an examining or a treating source. Tonapetyan, 242 F.3d at 1149; citing Magallanes, 881 F.2d at 751. However, the opinion of a nonexamining source may constitute substantial evidence when it is consistent with other independent evidence in the record. Tonapetyan, 242 F.3d at 1149; citing Magallanes, 881 F.2d at 752.

Therefore, although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability. Tonapetyan, 242 F.3d at 1148; citing Magallanes, 881 F.2d at 751. Where the ALJ gives sufficient reasons supported by substantial evidence in the record for rejecting a treating physician's opinion, there is no error. Tonapetyan, 242 F.3d at 1147. This is especially so if the treating physician's opinion is unsupported by rationale or treatment notes, or offers no objective medical findings to support the existence of a claimant's alleged condition. (Id.)

Here, the ALJ indicated that Dr. Park's treating source opinion is not supported by his own treatment notes. Dr. Park's treatment notes detail physical ailments that are, for the most part, controlled with proper medical treatment. Plaintiff's shoulder pain was

regularly treated with acetaminophen and the records do not show increasingly rigorous treatment for any of Plaintiff's impairments. If Plaintiff's limitations were as serious as Dr. Park indicated in his medical source statement, it would not be unreasonable to expect that Plaintiff's treatment notes from the very same physician would indicate greater impairment in his notes leading up to issuing the opinion that his patient was totally precluded from any work. In rejecting Dr. Park's medical source statement, the ALJ thoroughly reviewed and discussed the medical records from Dr. Park, his colleagues, and provided hospital records.

At the same time, the ALJ found that Dr. Do's nonexamining opinion was consistent with the other evidence in the record. Dr. Do identified the consistent diagnoses and treatment in the record, objectively discussed whether Plaintiff's diagnoses were supported by the record, and provided general information regarding those impairments Plaintiff claimed to have. The ALJ did not reject Dr. Park's opinion solely based on Dr. Do's opinion, but rather also considered other opinions from consulting state agency physicians and the record as a whole.

Plaintiff posits that Dr. Park's opinion appears to be based on the combined effect of Plaintiff's obesity, asthma, COPD, and edema and that the ALJ's opinion therefore lacks the support of substantial evidence. (Doc. 14-1 at 7.) These arguments, however, are wholly unpersuasive without a supporting medical record. Plaintiff's self-reported claims of numbness and issues both sitting and standing are not reflected in any medical evidence until Dr. Park's severe postural limitations in his RFC opinion. While Plaintiff has been hospitalized because of his asthma, the record lacks increasingly aggressive courses of treatment. The record reflects a history of treatment that mostly stayed the same over the course of a few years. Multiple entries throughout the record indicate Plaintiff was told that his quality of life and impairments would improve by adopting a healthier lifestyle that included eating better and exercising. A lack of aggressive medical and pharmaceutical intervention, combined with encouragement to lose weight and be more active, indicates that the consistent message to Plaintiff was that he was not and is not precluded from

activities, including some form of work. Plaintiff himself was looking for work as recently as the same year he applied for and testified regarding Social Security benefits.

Plaintiff is correct in arguing that Dr. Park's two-page check-list form cannot be the sole reason for discounting his treating physician opinion statement. The form's lack of explanation and supporting subjective evidence, combined with a rich record of treatment notes, and a consulting opinion that is in line with those treatment notes is, however, enough. Where the ALJ's decision regarding the treating physician's opinion was clearly articulated and supported by Plaintiff's medical record, there was no error.

## VII. CONCLUSION

For the reasons set forth above, the Court **RECOMMENDS** granting Defendant's Motion for Summary Judgment and denying Plaintiff's Motion for Summary Judgment.

This report and recommendation is submitted to the Honorable Rodger Benitez pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **June 23, 2017**. The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed on or before **July 7, 2017**. The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

Dated:  June 9, 2017

Hon. Peter C. Lewis
United States Magistrate Judge